THE CIUDAD DE REUS.

THE MARAVAL.

(District Court, S. D. New York. June 21, 1909.)

1. COLLISION (§ 69*)—ANCHORED VESSELS.

The Maraval *held* solely in fault for casting anchor in too close proximity to the Ciudad de Reus and for refusing to utilize her steam power to move away after the collision.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 87; Dec. Dig. § 69.*]

(Syllabus by the Judge.)

2. WORDS AND PHRASES—"WINDRODE."

A vessel is "windrode" when it is held in equilibrium between the wind and tide.

Convers & Kirlin, for the Maraval.

Curtis, Mallet-Prevost & Colt (Alfred H. Strickland, of counsel), for the Ciudad de Reus.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes.

ADAMS, District Judge. These are cross libels filed by the Trinidad Shipping & Trading Company, Limited, as owner of the steamship Maraval, and La Mutua Sociedad Anonima, as owner of the steamship Ciudad de Reus, to recover the damages sustained, alleged, respectively, to amount to $5,000 and $30,000, through a collision which occurred between those vessels in the early morning of January 5, 1908, while they were at anchor a short distance above Quarantine, Staten Island.

The Ciudad in her libel alleges:

"Third: On the morning of January 3rd, 1908, the 'Ciudad de Reus' was anchored at a proper place opposite Stapleton, Staten Island, City of New York, where she had a perfect right to be, the said steamer being then and also at the time of the collision as hereinafter mentioned, tight, staunch, strong and in every respect well manned, tackled, appareled and appointed, and having the usual and necessary complement of officers and men, and there being at all times hereinafter mentioned a proper lookout for the protection and safety of the said vessel. At about 2 o'clock in the morning of Sunday, January 5th, 1908, while the 'Ciudad de Reus' was anchored as aforesaid, the steamship 'Maraval' came to anchor near the steamship 'Ciudad de Reus.' At said time the 'Ciudad de Reus was carrying her regulation lights, which were properly set and burning brightly, and were plainly visible to the 'Maraval,' and at said time said 'Ciudad de Reus' had a good and competent lookout on duty. There was a strong current from the northeast. The weather was clear, with a strong but variable wind from the northwest. The 'Maraval,' without heeding the location of the 'Ciudad de Reus,' carelessly and negligently anchored very close to her; the result of this carelessness and negligence on the part of the 'Maraval' in choosing her anchorage was that subsequently the 'Maraval' came in collision with the 'Ciudad de Reus,' striking her on her starboard side amidships, doing serious injury to her pilot house, hull, boats, deck cabin, bridge and electrical apparatus, and doing other serious damage to be shown at the trial of the action.

After the collision the 'Maraval' refused to move away, although able to do so, and as the 'Ciudad de Reus' had not steam up, the two vessels were beaten together, although the officers and crew of the 'Ciudad de Reus' did everything in their power to prevent further damage.

That the two vessels remained together for several hours, and the 'Ciudad de Reus' was then obliged to and did call tugs to her aid, and was towed to a dock in Erie Basin, Brooklyn. That in her efforts to get away from the 'Maraval' the 'Ciudad de Reus' was obliged to and did cut her anchor chain, and a number of fathoms thereof and her anchor were lost. * * *

Fifth: The collision and the aforesaid resulting damages to said steamship 'Ciudad de Reus' were not due to any fault whatsoever on the part of those in charge of and navigating the steamship 'Ciudad de Reus,' but were due to the fault and negligence on the part of the steamship 'Maraval' and those in charge of her, in the following particulars:

1. In anchoring in too close proximity to the 'Ciudad de Reus.'

2. In not discharging the duties of a burdened vessel in providing such a margin of clearance between the two vessels as to make it impossible for said 'Maraval' to collide with the 'Ciudad de Reus.'

3. In failing to keep a good and competent lookout.

4. In not avoiding the 'Ciudad de Reus.'

5. In not starting her engines when the vessel began to swing, and thereby avoiding the 'Ciudad de Reus.'

6. In not pulling in her anchor chain when the vessel began to move towards the 'Ciudad de Reus.'

7. In not drawing away from the 'Ciudad de Reus' immediately after the collision.

8. In allowing her anchor chain to become entangled with the anchor chain of the 'Ciudad de Reus.' "

The Maraval in her libel alleges:

"Second: The steamship Maraval is of 2569 tons gross and 1622 tons net register. She is approximately 324 feet long and of 38 feet beam. On January 4th, 1908, the Maraval was on her voyage from Trinidad to New York. About 11:30 that night, she received a licensed Sandy Hook pilot on board in the vicinity of the Scotland Light Ship. The pilot immediately went on the vessel's bridge and thereafter took charge of and directed the navigation of the vessel. Under the directions of the pilot, the vessel proceeded to an anchorage off the quarantine station, and at 1:50 a. m. on January 5th anchored in 8 fathoms of water with 45 fathoms of cable. The regulation lights were properly set, and thereafter were burning brightly. A proper anchor watch was on duty. The night was dark but the weather was clear with occasional squalls of wind from the north-west. As the vessel lay at anchor her heading was in a general northerly direction, subject to occasional slight variations from the effect of the wind and the ebb tide.

Third: About 2:50 a. m. on January 5th, as the Maraval lay at anchor in the position above described, the steamer Ciudad de Reus bore down upon the Maraval from a north-westerly direction. The starboard side of the Ciudad de Reus struck the port side of the Maraval and did considerable damage, injuring a number of the latter's plates, her stanchions, bulwarks and superstructure. The Ciudad de Reus apparently had one anchor out which was insufficient to and did not hold the vessel. After striking the Maraval the Ciudad de Reus dragged along the port side of the Maraval until she came to a stop by reason of the fouling of her anchor with the anchor of the Maraval which was sufficient to and did hold both vessels. There did not appear to be any one upon the deck of the Ciudad de Reus when she came into collision with the Maraval, nor was any attempt made by those on the Ciudad de Reus to adopt any measures to avoid or lessen the collision and its effects. For a considerable length of time after the collision, the Ciudad de Reus remained fast to the Maraval and then was taken in tow by two tugs and towed to a dock on the Brooklyn shore. The extent of the damage to the Maraval resulting from the collision, including the damages for the loss of use of the Maraval during the period that reasonably and necessarily will be required to repair the damage caused by the collision, so nearly as it can be estimated now will be about $5,000.

Fifth: The collision above mentioned and the resulting damage to the Maraval were due wholly to and caused solely by the negligence of the Ciudad de Reus and those in charge of her, in the following among other respects that will be shown at the trial:

1. She was not properly manned, equipped and supplied.
2. She was not under the command nor in charge of competent persons.
3. She was not supplied with or she did not use adequate cable and anchors to hold her in the conditions then existing.
4. She did not have a proper anchor watch.
5. She did not take proper or timely measures to avoid a collision with the Maraval.
6. She carelessly and negligently collided with the Maraval which was lying at anchor."

The answers of the vessels were in conformity with the allegations of their libels.

The testimony shows that the Ciudad was about 255 feet long. She was light at the time, using water ballast, drawing 12 feet at the bow and 18 feet at the stern. She came to New York on the 3rd day of January. After finishing her business at Quarantine, she proceeded a short distance above and anchored at a place where she remained, according to her contention, until the collision took place. She had no steam available for moving.

The Maraval was 324 feet long. She came into the harbor as stated in her libel, about half loaded. She also proceeded to the north-

ward of Quarantine, and, it is claimed by her, anchored to await boarding by the Quarantine officer, outside of the general anchorage limits but inside a line from Robins Reef Light to Craven Shoal Buoy. She remained under steam and had steam available for use at the time of the collision.

Each vessel had about 45 fathoms of chain from the surface of the water to the anchors. The Maraval had an old-fashioned fluke anchor. The Ciudad had a patent revolving anchor.

About 2:45 o'clock a. m. of January 5th, the vessels collided, the Maraval on the starboard side of the Ciudad, and remaining together until about 10 o'clock a. m. when the Ciudad was towed away. During this period there was a change of tide to flood but owing to a strong north-west wind, the vessels did not swing completely to the tide but remained heading to the westward, being what one of the officers termed "windrode," that is held in equilibrium between the wind and tide.

Each claims a change of position by the other which brought about the collision. The Maraval contends that the Ciudad dragged her anchor from a position to the northward and westward of the Maraval, while the Ciudad claims that the Maraval came to anchor to the northward of the Ciudad and being given a foul berth, in a short time, about 10 minutes, after she dropped her anchor, she collided with the Ciudad, which had been anchored at the place of collision for 2 days.

The testimony is very conflicting and creates a situation of almost inextricable confusion. Some relief is afforded, however, by the statements of two officers of the steamer Royal Prince, which was anchored in the vicinity. She came to Quarantine about 7:10 p. m. of the 4th and left about noon of the 5th. She was lying so that Fort Tompkins bore about S. 3° E. and Robins Reef N. 2° E. This was probably somewhat outside of the eastward anchorage line. The chief officer said she was heading about north, with the wind about northwest, causing the vessel to lie athwart the tide. He did not notice any vessels anchored ahead of him but on the morning of the 5th, when it was beginning to get daylight, he saw the Ciudad somewhat to the north of his vessel. At that time he did not see the Maraval but later saw them together the Maraval being about north of the Ciudad. The second officer of the Royal Prince, was on watch from 12 to 4 of the 5th. He said the wind was squally from about northwest, the tide ebb; that there was a vessel about a mile ahead, a little on his port bow; that the wind was such as to cause him some anxiety with respect to his vessel dragging her anchor but she remained steady and did not drag; that about 12:30 or 12:45 o'clock he saw a steamer (the Maraval) coming into harbor very close to him and that she must have anchored above the first mentioned vessel (the Ciudad); that supposing she anchored above, she must have dragged her anchor to bring the vessels together; that if any other vessel than the one last mentioned had passed he would have noticed her; that he was sure she did not anchor between his vessel and the one already anchored ahead; that he saw the vessels afoul about 7 o'clock in the morning.

The testimony of the witnesses just mentioned was taken on behalf of the Maraval but not offered by her but put in evidence by the Ciudad. It was said by the Maraval that the depositions did not amount to anything in favor of either side but in view of the uncertainty caused by the conflicting accounts, they are very helpful and go far toward sustaining the Ciudad's account of the matter.

The only eyewitness from the Ciudad was her quartermaster who was acting as anchor watch. He said:

"A. While I was acting as lookout, walking on deck, the Maraval entered along the starboard side and proceeded about to the place where we had our anchor; and by the sound of the chain when it was let out I was able to determine that it was let down approximately over our anchor; the Maraval thereupon fell back until she was parallel with our vessel, and thereupon the Maraval proceeded with her bow in the direction of our bridge, and as soon as I noticed she was coming directly towards us, I went to notify the officer; before I got to the bridge I was afraid of being caught between the pilothouse and one of the boats, and I went around to the port side, and upon arriving at the bridge on the port side, she had collided with us already."

He further said that the bow of the Maraval struck the Ciudad amidships on the starboard side, almost at right angles, and in this the officers of the Maraval agree, though claiming that the position was the result of the Ciudad's drifting movement.

There has been a great deal of discussion, both in the testimony and briefs, with respect to the greater liability of the Ciudad to drag because of her patent anchor. It is probable that an old-fashioned anchor, one with fixed flukes, is more reliable for holding than the patent anchor, one with movable flukes. With respect to the use of these anchors, after speaking of the great advantages of the patent anchor, it is said in Knight's Seamanship, pp. 146, 147:

"In spite of the advantages above enumerated, the patent anchor cannot be regarded as fulfilling satisfactorily the ultimate purpose of an anchor if it is deficient in the power of holding a ship. This is, and must be, the final test in the matter. With regard to this point, there is a wide diversity of testimony but it may probably be asserted safely enough that in a critical situation most seamen would prefer to trust the old-fashioned anchor rather than the new one. In good stiff holding ground there is not much to choose between the two. If there is any difference here it is probably in favor of the double-fluked type. In soft mud this type is likely to drag, whereas the old style will usually work its way down until it holds. On a hard bottom, the old style has a much better chance of biting than the new one, the latter showing a disposition to slide along the ground, in spite of the tilting shoulder.

It may be laid down as a rule that the patent anchor always needs a longer scope of chain to bite and hold than does the old-fashioned one. This is because a slight upward pull on the ring drives the old-fashioned fluke into the ground but breaks out the flukes of the other type."

The foregoing extract fairly expresses the effect of the testimony in this case. Here the holding ground was good. Assuming, however, there was a greater liability on the part of the Ciudad to drag, it does not establish that she did so in the face of the testimony, which indicates that she did not, at least until the vessels were together, when it is probable that their anchors failed to work properly and that they dragged slightly on the change of the tide when the chains became more entangled and more was let out. The strain upon the anchors was then from a different direction and the situation of the an-

chors when raised about 8 o'clock in the morning does not seem to throw any light upon the dispute.

One of the witnesses most depended upon by the Maraval was the master of the tug boat Mutual, who was in the vicinity of the collision, but he did not appear to me to be very reliable. He "changed his mind" after he had been requested to look the situation over for the Maraval, subsequent to his stating the position to the counsel for the Ciudad. Another witness, also relied upon by the Maraval, was the master of the tug Charles F. Allen, one of the Quarantine boats, who at first stated the position of the Ciudad favorably to the Maraval. The effect of his testimony, however, was considerably diminished by his cross examination, where he declined to say he knew positively where the Ciudad was anchored and it appeared that a mark on the chart purporting to represent his view of the position was not made by him.

The place where the vessels were anchored was well protected from the effects of a north-west wind, by the hills of Staten Island, and the reports of the Weather Bureau that there was a velocity of from 24 to 34 miles is not of much importance as affecting the decision here. Such a wind upon well anchored vessels in an unprotected place would ordinarily have little effect. The ebb tide which was prevailing at the time of the collision took a south-west course. The vessels, which were subject to the influences of the wind and tide, were more affected by the latter, so that if freed from their moorings would have drifted south-west, not south-east, which would have been the case if the wind were stronger. Therefore, the Maraval's contention that the Ciudad drifted south-easterly must be rejected.

The whole testimony shows that both of the vessels were anchored somewhat within the anchorage limits and that the Maraval anchored too close to the Ciudad with the result of bringing about the collision. I think the former should be especially censured for refusing to use her steam power to move away from the Ciudad because such a course might be prejudicial to the Maraval. In other words, additional damage was done for the purpose of preserving or making evidence.

There will be a decree for La Mutua Sociedad Anonima, with an order of reference. The libel of the Trinidad Company is dismissed.